## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES B. FRASIER, JR.,                     )
CO-PERSONAL REPRESENTATIVE OF  )
THE ESTATE OF SYLVIA FRASIER,    )
3608 Buckingham Road                     )
Baltimore, Maryland 21207               )
                                                        )
and                                                     )
                                                        )
WENDY M. EDMONDS,                       )
CO-PERSONAL RERPRESENATIVE OF )
THE ESTATE OF SYLVIA FRASIER,    )
4504 Myles Court                             )
Upper Marlboro, Maryland 20772       )
                                                        )
ELOISE FRASIER,                             )
7911 Dellwood Avenue                      )
Lanham, Maryland 20706                   )
                                                        )
JAMES FRASIER, SR.,                        )
7911 Dellwood Avenue                      )
Lanham, Maryland 20706                   )
                                                        )
          Plaintiffs,                             )
                                                        )
v.                                                      )          Civil Action No. _____
                                                        )
HP ENTERPRISE SERVICES, LLC,       )
5400 Legacy Drive                            )
Plano, Texas 75024                           )
**Serve:**                                          )
CT Corporation System                      )
1015 15th Street, N.W.                  )
Washington, D.C. 20005                     )
                                                        )
THE EXPERTS, INC.,                         )
2400 E. Commercial Boulevard          )
Suite 420                                          )
Fort Lauderdale, Florida 33308           )
**Serve:**                                          )
Alex Zaldivar, Registered Agent         )
2400 E. Commercial Boulevard          )
Suite 420                                          )
Fort Lauderdale, Florida 33308           )

)

Defendant.                                        )
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs James B. Frasier, Jr., and Wendy M. Edmonds, Co-Personal Representatives of the Estate of Sylvia Renee Frasier, and Eloise Frasier and James Frasier, Sr. (collectively "Plaintiffs"), by and through undersigned counsel, hereby sue HP Enterprise Services, LLC ("HPES"), and The Experts, Inc. ("The Experts") (collectively "Defendants"), and state as follows:

## INTRODUCTION

1.     Plaintiffs bring this action to recover damages arising from the death of Sylvia Renee Frasier as a result of the Washington Navy Yard shooting that took place on September 16, 2013, in Washington, D.C.  On that day, Aaron Alexis ("Mr. Alexis") fatally shot twelve (12) people, including Sylvia Renee Frasier, and injured four (4) others in a mass shooting.  Plaintiffs sue Defendants under the District of Columbia Survival Act, D.C. Code § 12-101 *et seq.,* and the District of Columbia Wrongful Death Act, D.C. Code § 16-2701 *et seq.*

## JURISDICTION AND VENUE

2.     This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (1) on the face of the Complaint, it is clear that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and (2) there is complete diversity of citizenship between Plaintiffs and Defendant.

3     This Court is the proper venue for this matter pursuant to 28 U.S.C. 1391.

## PARTIES

4.     Plaintiff James B. Frasier, Jr., is the brother of Sylvia Renee Frasier and Co-Personal Representative of the Estate of Sylvia Renee Frasier, Estate No. 19077, which was opened on November 21, 2013, in the Orphans' Court for Charles County, Maryland.

5.     Plaintiff Wendy M. Edmonds, is the sister of Sylvia Renee Frasier and Co-personal Representative of the Estate of Sylvia Renee Frasier, Estate No. 19077, which was opened on November 21, 2013, in the Orphans' Court for Charles County, Maryland.

6.     Plaintiff Eloise Frasier is the mother of Sylvia Renee Frasier and is an adult resident of Prince George's County, Maryland.

7.     Plaintiff James Frasier, Sr., is the father of Sylvia Renee Frasier and is an adult resident of Prince George's County, Maryland.

8.     Defendant HPES is a limited liability company organized under the laws of the State of Texas with its principal place of business at 5400 Legacy Drive, Plano, Texas 75024.

9.     Defendant The Experts was the employer of Mr. Alexis at the time he executed Sylvia Renee Frasier, and is a limited liability company organized under the laws of the State of Florida with its principal place of business located at 2400 E. Commercial Blvd., Suite 420, Fort Lauderdale, Florida 33308.

## STATEMENT OF FACTS

10.     Defendant HPES contracted with the Department of Defense ("DoD") to provide services including at the Washington Navy Yard.

11.     Defendant The Experts has been a party to subcontracts with Defendant HPES and its subsidiary companies, providing services through 250 employees on HP contracted

projects with the DoD and the United States Navy ("Navy") at the Washington Navy Yard and throughout the world.

12.     Defendant The Experts employed Mr. Alexis for six (6) months in 2013 during which time employee Mr. Alexis was subjected to two (2) background investigations checks by Defendant The Experts.

13.     Mr. Alexis was investigated in 2007 for reliance by the federal government prior to the issuance of a "secret" government security clearance to Mr. Alexis.

14.     A security clearance investigation is an inquiry into an individual's loyalty, character, trustworthiness and reliability to ensure that he or she is eligible for access to national security information. The investigation focuses on an individual's character and conduct, emphasizing such factors as honesty, trustworthiness, reliability, financial responsibility, criminal activity, emotional stability, and other similar and pertinent areas. All investigations consist of checks of national records and credit checks. Some investigations also include interviews with individuals who know the candidate for the clearance as well as the candidate himself/herself. In the military all classified information is divided into one of three categories: confidential, secret and top-secret. Conditions that could raise security concerns include emotional mental and personality disorders, a pattern of high risk irresponsible aggressive antisocial or emotionally unstable behavior and allegations of criminal conduct regardless of whether the person was formally charged.

15.     Sylvia Renee Frasier was, at all times material hereto, a civilian employee of the United States Navy Sea Systems Command (NAVSEA) Headquartered at the Washington Navy Yard.

16.     On September 16, 2013, Mr. Alexis presented a reasonably foreseeable risk of harm and/or death to the safety of fellow employees at the Washington Navy Yard.

17.     On and prior to Mr. Alexis gaining access to the Washington Navy Yard on September 16, 2013, Defendants knew or reasonably should have known the following facts which posed a reasonably foreseeable risk of harm and/or death to the safety of fellow employees on the premises including:

a.      Mr. Alexis was not qualified to possess a top-secret security clearance.

b.      Mr. Alexis posed a reasonably foreseeable risk of harm and/or death to the safety of fellow employees.

c.      Mr. Alexis had exhibited a pattern of high risk, irresponsible, aggressive, antisocial, and emotionally unstable behavior.

d.      Mr. Alexis had demonstrated a history or pattern of criminal activity that created doubt about his judgment, reliability, and trustworthiness.

e.      In 2004, Mr. Alexis shot the rear tires of the vehicle owned by a construction worker during work in the Seattle neighborhood where he lived.  Mr. Alexis told police he had an anger fueled "blackout" and that his rampage was prompted by his fellow workers who "mocked" and "disrespected" him.

f.      Mr. Alexis' father told New York Police that Alexis had anger management problems associated with Post Traumatic Stress Disorder (PTSD).

g.      Mr. Alexis was arrested at least once in 2010 for firing a gun through the ceiling of an apartment because he thought the resident who lived above him was causing too much noise and disturbance.

h.    Mr. Alexis routinely complained about lack of jobs and money and liked to cavalierly and routinely carry an unpermitted 45 caliber pistol in his belt.

i.    Mr. Alexis had a quick temper and caused police to respond to a disturbance when he punched a man in the nose over an argument about a girl in DeKalb County, Georgia.

j.    During 2012, while Mr. Alexis was working for Defendant The Experts, he constantly and angrily complained that the company had not paid him in weeks and he was having trouble paying for his car to be fixed.

k.    In August 2013, a Newport, Rhode Island Police Report showed that Mr. Alexis told people he was hearing voices in a hotel while they are on a business trip.  He also reported that he was being "zapped" with microwaves from unseen adversaries trying to prevent him from sleeping.

l.    Before September 2013, Mr. Alexis had been sent by Defendant The Experts to military installations in Lytle Creek Virginia, Newport Rhode Island, Cherry Point North Carolina and later to Washington, D.C.

m.    Defendant The Experts acknowledged that it took Mr. Alexis off his Newport Rhode Island assignment "for a few days rest" after he reported that he was hearing voices and being bombarded with microwaves.  While Defendant The Experts moved Mr. Alexis from hotel to hotel, it failed to have Mr. Alexis professionally evaluated by psychiatrists.  Eventually, Defendant The Experts allowed Mr. Alexis to return to work even though he demonstrated these psychotic behaviors and never received treatment for them.

n.      Defendant The Experts finally moved Mr. Alexis from Rhode Island to the

Washington Navy Yard where he was permitted access with a top-secret security

clearance pass.

o.      Defendant The Experts knew that Mr. Alexis held a delusional belief that he was

being controlled or influenced by low-frequency electromagnetic waves.

p.      On September 14, 2013, two (2) days before the fatal shooting at the Washington

Navy Yard, Mr. Alexis bought a shotgun and ammunition in Lorton, Virginia.

Mr. Alexis sawed off the stock and barrel of the shotgun and carved into the gun

the words "my ELF weapon" and "end to the torment!" ELF refers to "extremely

low-frequency" in Navy submarine communications.

q.      Mr. Alexis carried an undetected firearm and many rounds of live ammunition

onto the Washington Navy Yard.

**I.      MR. ALEXIS' FIRST ARREST**

18.      In 2004, Mr. Alexis shot the rear tires of the vehicle owned by a construction

worker doing work in the Seattle neighborhood where he lived.  Mr. Alexis told police he had an

anger fueled "blackout" and that this rampage was prompted by his fellow workers who

"mocked" and disrespected him.

19.      Mr. Alexis' father told New York Police that Alexis had angered management

problems associated with PTSD.

**II.      MR. ALEXIS' SECOND ARREST**

20.      On September 23, 2008, Mr. Alexis received a Non-Judicial Punishment for

unauthorized absence that included forfeiture of one-half (1/2) day of pay per month for two (2)

months and a reduction of one pay grade.  Both were suspended.  Mr. Alexis was absent because

he was in jail August 10-11 in DeKalb County, Georgia, following an arrest for disorderly conduct outside a nightclub. The incident stayed on his service record from that date forward.

21.      Only July 12, 2009, Mr. Alexis received a second Non-Judicial Punishment for being drunk and disorderly and was reduced one pay grade. This Non-Judicial Punishment was due to Mr. Alexis leaping off stairs and breaking his ankle while reportedly intoxicated. There was no police involvement. Mr. Alexis appealed.

### III.    MR. ALEXIS' THIRD ARREST

22.      On September 5, 2010, Mr. Alexis was arrested in Fort Worth Texas, for discharging a firearm in his residence the previous day. According to law enforcement documents, Mr. Alexis said he accidentally discharged the firearm while cleaning it. No charges were filed. After his arrest, Mr. Alexis' Commanding Officer initiated proceedings to administratively separate him from the Navy. But when Mr. Alexis was not charged for unlawfully discharging a firearm, the proceedings were halted.

### IV.    MR. ALEXIS' EMPLOYMENT HISTORY

23.      Mr. Alexis was employed by the Navy from 2007 to 2011, where he worked as an aviation electrician's mate third class whose work focused on non-avionics electrical systems of Navy aircraft.

24.      From 2008 to 2011, Mr. Alexis served with Fleet Logistics Support Squadron 46 at the Naval Air Station Joint Reserve Base in Fort Worth, Texas. Mr. Alexis worked on C-40s, a military version of the Boeing 737 that the Navy uses as a cargo plane.

25.      Mr. Alexis was discharged from the Navy in 2011 after the Navy charged him with a "pattern of misconduct" of at least eight (8) episodes including insubordination, disorderly

conduct, unauthorized absences from work and drunkenness.  Mr. Alexis' rank was petty officer third class.

26.     After leaving the naval reserves, Mr. Alexis worked part-time as a waiter and delivery driver at the Happy Bowl Thai Restaurant in Whiter Settlement, a suburb of Fort Worth, Texas.

27.     From September 2012 to January 2013, Mr. Alexis worked in Japan for Defendant The Experts.

28.     Mr. Alexis returned to the United States in July 2013 and continued working for Defendant The Experts at the Washington Navy Yard among other assignments in the summer of 2013.

## V.     MR. ALEXIS' DELUSIONAL BEHAVIOR REPORTED TO DEFENDANT THE EXPERTS

29.     On August 7, 2013, when Mr. Alexis called the Newport police complaining about his delusions of being pursued and threatened by fictional people, Mr. Alexis made similar mentally deranged alarming complaints to the hotel desk clerk at the Marriott Hotel.

30.     The Marriott Hotel desk clerk spoke with the police officers investigating Mr. Alexis' complaint and thereafter contacted an HPES site manager who was closely supervising Mr. Alexis when he was in Rhode Island.

31.     The Marriott Hotel desk clerk explained Mr. Alexis' alarming behavior to the HPES site manager and/or Defendant The Experts.

32.     The HPES site manager and/or Defendant The Experts told the Marriott hotel desk clerk they would take care of the problem with Mr. Alexis and give him a few days of to recover from his stress.

33.     On August 7, 2013, The HPES site manager relayed the alarming report about Mr. Alexis delusional behavior to Defendant The Experts to follow-up and respond to the episode according to security protocol, contractual agreements, and applicable Navy's duty to supervise its employees instructions including the duty to report "security incidents/adverse information" under the Navy Personnel Security Program ("PSP").

34.     After being notified of the "security incident/adverse information" involving Mr. Alexis, Defendant The Experts immediately revoked employee Mr. Alexis' security clearance on August 7, 2013.

## VI.   DUTY OF CONTRACTORS/SUBCONTRACTORS TO REPORT ADVERSE INFORMATION/SECURITY INCIDENT ABOUT EMPLOYEES

35.     Contractors and subcontractors who enter into contracts with United States agencies subject to and must follow the requirements of the National Industrial Security Program ("NISP"). The provisions and requirements of NISP was established in the DoD National Industrial Security Program Operating (NISP0M) DOD 5220.22-M. (February 2006).

36.     The March 28, 2013, revision of the NISP Operating Manual requires the following reports to be submitted to the Cognizant Security Agency ("CSA") which denotes the DoD and other agencies:

"1-302 Reports to be submitted to the CSA

    a.   Adverse information. Contractors shall reports adverse information coming to their attention concerning any of their cleared employees. Reports based on rumor on innuendo should not be made. The subsequent termination of employment of an employee does not obviate the requirement to submit this report. If the individual is employed on a federal installation, the contractor shall

furnish a copy of the report and its final disposition to the commander or head of
the installation."

37.     Adverse information includes any "security incident".

38.     Contractors and subcontractors have a duty to ensure that DoD contract security
classification specifications (including NISPOM) are incorporated into each subcontract.

39.     Adverse information and changes in cleared employee status may be reported
electronically via JPAS.

40.     The contractor and subcontractor who contract with United States agencies are
required to sign DoD security agreement (DD form 441) which requires compliance with the
provisions of NISPOM.

41.     Defendants had a duty to immediately report the security incident/adverse
information involving Mr. Alexis and the Newport Police Department episode/investigation of
August 7, 2013 to:

    a.     The commander of the Newport Naval Station

    b.     The DoD CSA

    c.     Clearance eligibility in Joint Personnel Adjudication System ("JPAS")

    d.     DoD Defense Security Service ("DSS")

    e.     DoD Defense Security Service Industrial Security Program Office

42.     Defendants failed to report and breached their duty to report the security
incident/adverse information involving Mr. Alexis and the Newport Department
episode/investigation of August 7, 2013 as required by NISPOM.

## VII.   THE SHOOTING RAMPAGE AT THE WASHINGTON NAVY YARD

43.     Mr. Alexis was ordered by his employer, Defendant The Experts, to return to Washington, D.C. following the "security incident/adverse information" in Newport Rhode Island.

44.     Mr. Alexis arrived in Washington, D.C. on August 25, 2013.  Mr. Alexis stayed at two different hotels in Bethesda and Pentagon City from August 31, 2013, through September 7, 2013, before moving to a Residence Inn on September 7, 2013, which is where he lived until the shooting on September 16, 2013.

45.     Mr. Alexis began work at the Washington Navy Yard at Building 196 with his restored security clearance (CAC) on September 9, 2013.

46.     On Saturday, September 14, 2013, Mr. Alexis traveled to a gun store in Lorton, Virginia where he purchased a Remington 870 shotgun and ammunition.  Mr. Alexis also stopped at a home improvement store in Northern Virginia where he bought a hack saw used to saw of the stock and barrel of the shotgun.

47.     Mr. Alexis carved four phrases into the shotgun including "better of this way", "my ELF [extremely low frequency] weapon", "not what y'all say" and "end to the torment". Mr. Alexis wrote a note in his computer stating "ultra low frequency attack is what I've been subject to for the last three months, and to be perfectly honest that is what has driven me to this."

48.     At 7:53 a.m. on September 16, 2013, Mr. Alexis drove his rental car, a blue Toyota Prius with New York license plates to the gates of the Washington Navy Yard.  Mr. Alexis showed the guard his security clearance CAC card and was permitted to drive into the facility without any screening or other search for weapons.

49.     At the time he drove into the Washington Navy Yard, Mr. Alexis unlawfully had in his possession prohibited by 18 U.S.C. § 930 a backpack containing the shotgun and ammunition.

50.     Mr. Alexis entered Parking Garage 28 located directly across from Building 197.

51.     At 8:08 a.m. Mr. Alexis exited Parking Garage 28 on foot carrying the backpack containing the shotgun and ammunition.

52.     There was no magnetometer, video cameras, or other security screening devices situated at the entrance to Building 197.  There were no security guards or other persons who screen and search for prohibited items as a condition of Mr. Alexis entering Building 197.  No attempt was made whatsoever to screen or search for prohibited items including firearms and ammunition as a condition of accessing Building 197.

53.     There were no methods of mitigation at the entrance to Building 197 which would mitigate the risk/threat of inside active shooter carrying prohibited items including firearms and ammunition to access Building 197 without screening, detection, and efforts to prohibit access.

54.     Mr. Alexis entered Building 197 without being observed and/or screened and/or searched for prohibited items as a condition of entering the building.

55.     Mr. Alexis took the elevator to the fourth floor and entered the men's bathroom carrying the backpack containing firearms and ammunition.

56.     At 8:15 a.m., Mr. Alexis crossed a hallway into Four West area of Building 197 armed with a shotgun and ammunition and began shooting victims at random.

57.     At 8:17 a.m., the first 911 call was made from the fourth floor after several victims were shot.

58.     At 8:20 a.m., Mr. Alexis left the fourth floor by way of the stairs and entered the third floor shooting victims at random.

59.     Mr. Alexis traveled from the first to the third floors shooting victims.  At one point he picked up a Beretta handgun from a law enforcement officer he shot.

60.     At 9:25 a.m., Mr. Alexis was shot dead by law enforcement responders.

61.     Mr. Alexis shot dead a total of twelve (12) people and wounded four (4) others.

## CAUSES OF ACTION

### COUNT I
### (NEGLIGENCE-SURVIVAL ACTION)

62.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 61 of this Complaint and further state as follows.

63.     Plaintiffs Wendy M. Edmonds and James B. Frasier, Jr., are Co-Personal Representatives of the Estate of Sylvia Renee Frasier.

64.     Plaintiffs Eloise Frasier and James Frasier, Sr., are the mother and father of Sylvia Renee Frasier and are the heirs or next of kin of Sylvia Renee Frasier under District of Columbia law.

65.     As set forth above, Defendants knew or reasonably should have known that Mr. Alexis posed a reasonably foreseeable risk of harm and/or death to the safety of fellow employees on the premises including Sylva Renee Frasier.

66.     Defendants had a duty to:

    a.     Hire, supervise, control, monitor, report, warn, and discipline their employees in a non-negligent manner.

    b.     Warn others of a foreseeable zone of danger in a non-negligent manner.

    c.     Maintain a safe workplace in a non-negligent manner.

d.    Immediately report the security incidenst/adverse information involving Mr. Alexis in a non-negligent manner.

e.    Otherwise comply with District of Columbia law.

67.    Defendants breached their duties by failing to:

a.    Immediately assess and warn the Navy that Mr. Alexis episode was a "security incident/adverse information".

b.    Immediately assess and warn the Navy that Mr. Alexis was a security risk to the Navy personnel and civilian employees.

c.    Immediately report/warn the Navy that Mr. Alexis episode as a "security incident/adverse information".

d.    Immediately deliver the information contained in the Newport police report to appropriate Navy offices and offices pursuant to an employer's duty to warn, security protocol, contractual agreements, and applicable Navy instruction including the duty to report/warn "security incidents/adverse information" under the Navy's PSP.

e.    Immediately report Mr. Alexis' episode to the DON CAF via JPAS.

f.    Immediately investigate the episode involving Mr. Alexis.

g.    Immediately require Mr. Alexis to be promptly and properly evaluated for mental instability.

h.    Immediately inform the Navy that the security clearance of Mr. Alexis had been revoked by them.

i.    Prohibit restoration of Mr. Alexis' security clearance pending reporting and investigation of the "security incident/adverse information" by the Navy according to established applicable Navy instructions.

j.    Immediately notify each and every Navy commander of every facility where Mr. Alexis was working or would be assigned to work about Mr. Alexis' episode, Mr. Alexis' "security incident/adverse information", and the revocation of Mr. Alexis security clearance including the Commander of the Washington Navy Yard.

k.    Refrain from "covering up" Mr. Alexis "security incident/adverse information".

l.    Terminate Mr. Alexis immediately.

68.    Defendants further breached their duties by concealing Mr. Alexis' "security incident/adverse information" from the DoD and others.

69.    Defendants' breaches thereby caused Sylvia Renee Frasier's injuries which resulted in her subsequent death.

70.    Upon information and belief, Sylvia Renee Frasier lived for a period of time after being shot by Mr. Alexis.

71.    Upon information and belief, Sylvia Renee Frasier suffered severe physical pain, as well as excruciating mental anguish and fear of her impending death.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in the amount of $25,000,000 for damages including pain and suffering, lost future earnings, medical expenses, and any other economic and non-economic damages recoverable under

District of Columbia law, plus reasonable attorneys' fees, interest, costs, and any other relief that the Court deems just or that may be proven at trial or otherwise.

## COUNT II
### (NEGLIGENCE-WRONGFUL DEATH)

72.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 71 of this Complaint and further state as follows.

73.     Plaintiffs Eloise Frasier and James Frasier, Sr., are the mother and father of Sylvia Renee Frasier and are the heirs or next of kin of Sylvia Renee Frasier under District of Columbia law.

74.     As set forth above, Defendants knew or reasonably should have known that Mr. Alexis posed a reasonably foreseeable risk of harm and/or death to the safety of fellow employees on the premises including Sylva Renee Frasier.

75.     As set forth above, Defendants had a duty to:

    a.     Hire, supervise, control, monitor, report, warn, and discipline their employees in a non-negligent manner.

    b.     Warn others of a foreseeable zone of danger in a non-negligent manner.

    c.     Maintain a safe workplace in a non-negligent manner.

    d.     Immediately report the security incidents/adverse information involving Mr. Alexis in a non-negligent manner.

    e.     Otherwise comply with District of Columbia law.

76.     As set forth above, Defendants breached their duties by failing to:

    a.     Immediately assess and warn the Navy that Mr. Alexis episode was a "security incident/adverse information".

17

b.     Immediately assess and warn the Navy that Mr. Alexis was a security risk to the Navy personnel and civilian employees.

c.     Immediately report/warn the Navy that Mr. Alexis episode as a "security incident/adverse information".

d.     Immediately deliver the information contained in the Newport police report to appropriate Navy offices and offices pursuant to an employer's duty to warn, security protocol, contractual agreements, and applicable Navy instruction including the duty to report/warn "security incidents/adverse information" under the Navy's PSP.

e.     Immediately report Mr. Alexis' episode to the DON CAF via JPAS.

f.     Immediately investigate the episode involving Mr. Alexis.

g.     Immediately require Mr. Alexis to be promptly and properly evaluated for mental instability.

h.     Immediately inform the Navy that the security clearance of Mr. Alexis had been revoked by them.

i.     Prohibit restoration of Mr. Alexis' security clearance pending reporting and investigation of the "security incident/adverse information" by the Navy according to established applicable Navy instructions.

j.     Immediately notify each and every Navy commander of every facility where Mr. Alexis was working or would be assigned to work about Mr. Alexis' episode, Mr. Alexis' "security incident/adverse information", and the revocation of Mr. Alexis security clearance including the Commander of the Washington Navy Yard.

     k.     Refrain from "covering up" Mr. Alexis "security incident/adverse information".

     l.     Terminate Mr. Alexis immediately.

77.     Defendants further breached their duties by concealing Mr. Alexis' "security incident/adverse information" from the DoD and others.

78.     As a direct and proximate result of Defendants' breaches, Sylvia Renee Frasier was shot dead by Mr. Alexis on September 16, 2013.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in the amount of $25,000,000 for damages including funeral and burial expenses, loss of financial support, loss of the pecuniary value of services expected to be performed by Sylvia Renee Frasier, a loss of care, guidance, education, training, and advice, and any other economic and non-economic damages recoverable under District of Columbia law, plus reasonable attorneys' fees, interest, costs, and any other relief that the Court deems just or that may be proven at trial or otherwise.

Dated: September 14, 2015

Respectfully submitted,

*James E. McCollum, Jr.*

James E. McCollum, Jr.
D.C. Bar No. 398117

*Amit K. Sharma*

Amit K. Sharma
D.C. Bar No. 503604

McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, Maryland 20740
Tel:     (301) 864-6070
Fax:     (301) 864-4351
jmccollum@jmlaw.net
asharma@jmlaw.net

*Attorneys for Plaintiffs Eloise Frasier and
James Frasier, Sr., and Wendy M. Edmonds
and James B. Frasier, Jr., Co-Personal
Representatives of the Estate of Sylvia Renee
Frasier*

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of their claims.

James E. McCollum, Jr.